# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CAMILLE MCCULLOUGH and
MELANIE MONROE,**

                **Plaintiffs,**

**-vs-**                                    **Case No.  6:10-cv-1600-Orl-22DAB**

**NATIONAL ASSOCIATION OF
COUNTIES, NACO RESEARCH
FOUNDATION, NACO FINANCIAL
SERVICES CORP., NACO FINANCIAL
SERVICES  CENTER,  and
NATIONWIDE RETIREMENT
SOLUTIONS, INC.,**

                **Defendants.**

_____

## ORDER

This cause comes before the court for consideration of Defendants National Association of Counties ("NACo"), NACo Research Foundation, NACo Financial Services Corp., and NACo Financial Services Center's (collectively "NACo") Motion to Dismiss (Doc. No. 58); Nationwide Retirement Solutions, Inc.'s ("Nationwide") Motion to Dismiss (Doc. No. 59); and Plaintiffs Camille McCullough and Melanie Monroe's Motion for Leave to File an Amended Complaint.  (Doc. No. 116.)

## I.  PROCEDURAL HISTORY

Plaintiffs represent a putative class of persons who were employed by a government entity with a membership in NACo, and who participated in the Section 457 Deferred

Compensation Plan for Public Employees endorsed by NACo and administered by Nationwide.[1] (Doc. No. 54 ¶¶ 42, 43.)  Plaintiffs filed a First Amended Complaint on February 18, 2011, (Doc. No. 54), which Nationwide and NACo moved to dismiss for failure to state a claim.  (Doc. Nos. 58 & 59.)  On August 16, 2011, Plaintiffs moved to amend their First Amended Complaint. (Doc. No. 116.)  NACo and Nationwide jointly oppose Plaintiffs' proposed amendment.  (Doc. No. 118.)

## II. BACKGROUND

For present purposes, the Court accepts as true the following facts from Plaintiffs' First Amended Complaint, except where discussed herein.  More than 2,000 counties maintain a membership with NACo, a provider of services and products for county government elected officials, administrators, employees and citizens.  (Doc. No. 54 ¶ 12.)  Nationwide administers retirement plans for state and local government employees.  (*Id.* at ¶ 13.)  Together, Nationwide and NACo provide county employees with a "section 457" deferred compensation plan, which allows government employees to defer compensation voluntarily on a pre-tax basis through payroll deduction.  (*Id.* at ¶¶ 13, 14.)

Plaintiffs Camille McCullough and Melanie Monroe participated in Nationwide's Section 457 Deferred Compensation Plan (the "Plan") while employees of the Orange County Fire Department and the Orange County Corrections Department, respectively.  (*Id.* at ¶¶ 30, 34, 37, 40.)  Both departments operate under the Orange County Board of County Commissioners (the "OCBCC"), a member of NACo.  (*Id.* at ¶¶ 32, 38, 39.)  In 1989, the OCBCC adopted the Plan pursuant to NACo's Section 457 Deferred Compensation Program (the "Program").  (Doc. Nos.

---

[1] Plaintiffs' motion to certify the class, filed on July 1, 2011, is currently pending.  (Doc. No. 96.)

54-1, 54-4.)

NACo endorsed Nationwide to its member counties as a deferred compensation provider. (Doc. No. 54 ¶ 17.)  "While NACo's disclosure asserted that NACo conducted a due diligence process before choosing to endorse Nationwide's Plan, and that NACo continues to evaluate the Plan to keep it competitive, the actual quality of Nationwide's Plan suggests otherwise."  (*Id.* at ¶ 18.)  In 2009, NACo publicly disclosed that it sponsored the Nationwide Plan in exchange for an annual fee, which totaled $7,400,000.00 in 2008.  (*Id.* at ¶ 17.)  Though Nationwide pays NACo a multi-million dollar annual fee in exchange for NACo's promotion and endorsement of the Plan, Nationwide and NACo did not negotiate the fee agreement for the benefit of Plan participants.  (*Id.* at ¶¶ 15, 24.)

Rather, Nationwide's payment of the annual fee to NACo indicates that Nationwide could have lowered the cost of the Plan, which "is a complex, high cost, high risk, tax-deferred variable annuity unsuitable for government retirement savings plans."  (*Id.* at ¶¶ 18, 19.)  The "majority of the Plan assets are steered into proprietary investment options and unaffiliated mutual funds that pay revenue sharing and other kick-backs to Nationwide."  (*Id.* at ¶ 19.)  While subject to substantial insurance charges, withdrawal penalties and investment options with high underlying fund costs, the variable annuity does not provide an additional tax benefit to the already tax-advantaged section 457 Plan.  (*Id.*)  The high costs associated with the variable annuity enable Nationwide to pay NACo the annual endorsement fee, but reduce the net rate of return enjoyed by Plan participants.  (*Id.* at ¶ 23.)

Plaintiffs allege that Nationwide and NACo breached the fiduciary duties owed to Plaintiffs in violation of ERISA (Count I); that NACo breached its fiduciary duty under state law

(Count II); that Nationwide aided and abetted NACo's breach of fiduciary duty (Count III); that Nationwide breached its fiduciary duty under state law (Count IV); and that NACo aided and abetted Nationwide's breach of fiduciary duty (Count V).  Specifically, Nationwide breached the fiduciary duty owed to Plaintiffs (1) by paying NACo the annual multi-million dollar fee to promote and endorse the Plan, which reduced Plaintiffs' rate of return on their Plan investments and (2) by providing Plan participants with a variable annuity, which offered no additional tax benefits but subjected Plaintiffs' investments to substantial charges, penalties and fees.  (*Id.* at ¶¶ 67, 105.)   NACo breached the fiduciary duty owed to Plaintiffs by accepting the annual multi-million dollar fee from Nationwide for promoting and endorsing the Plan, despite the fact that the fee reduced Plaintiffs' rate of return on their Plan investments.  (*Id.* at ¶¶ 68, 84.)

### III. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim, the court must accept as true all factual allegations in the complaint and draw all inferences derived from those facts in the light most favorable to the plaintiff.  *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir. 1994).  A plaintiff must supply "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 556).

If documents attached to the complaint are central to the plaintiff's claim and the authenticity of the documents is not challenged, a court may consider the documents on a motion to dismiss without converting the motion into one for summary judgment.  *Day v. Taylor*, 400

F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)).

When exhibits attached to the complaint contradict the general and conclusory allegations of the

pleading, the exhibits govern.  *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

Similarly, "[i]f the appended document, to be treated as part of the complaint for all purposes

under Rule 10(c), reveals facts which foreclose recovery as a matter of law, dismissal is

appropriate."  *Id.* (citations and quotations omitted).

## IV. ERISA BREACH OF FIDUCIARY DUTY

Congress enacted ERISA "to promote the interests of employees and their beneficiaries

in employee benefit plans."  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983).  "Employee

benefit plans" include employee welfare benefit plans and employee pension benefit plans.  29

U.S.C. § 1002(3).  An "employee pension benefit plan" means "any plan, fund, or program . . .

established by an employer or by an employee organization, or by both, to the extent that . . .

such plan, fund, or program provides retirement income to employees or results in a deferral of

income by employees . . . ."  29 U.S.C. § 1002(2)(A).  "The gist of ERISA's definitions of

employer, employee organization, participant, and beneficiary is that a plan, fund or program

falls within the ambit of ERISA only if the plan, fund, or program covers ERISA participants

because of their employee status in an employment relationship, and an employer or employee

organization is the person that establishes or maintains the plan, fund, or program."  *Donovan v.

Dillingham*, 688 F.2d 1367, 1371 (11th Cir. 1982).  An employer "establishes" a plan through

"some degree of implementation by the employer going beyond a mere intent to confer a

benefit."  *Anderson v. UNUM Provident Corp.*, 369 F.3d 1257, 1264 (11th Cir. 2004).

While broad in scope, ERISA exempts "governmental" employee benefit plans from its

coverage.  29 U.S.C. § 1003(b)(1).  A "governmental plan" is "a plan established or maintained

for its employees by . . . the government of any State or political subdivision thereof, or by any

agency or instrumentality of any of the foregoing."  29 U.S.C. § 1002(32).  Plaintiffs allege that

the Plan is not a governmental plan because NACo and Nationwide, both non-governmental

entities, established it.  (Doc. No. 54 ¶¶ 52, 54, 56.)  NACo and Nationwide move to dismiss

Count I because the exhibits attached to the First Amended Complaint contradict Plaintiffs'

allegations that they established the Plan.[2]  Furthermore, Defendants contend that the exhibits

confirm that the OCBCC established the Plan, rendering it a governmental plan exempt from

ERISA.[3]

## A.  The Plan

Plaintiffs describe the Plan as "Nationwide's Section 457 Deferred Compensation Plan

for Public Employees" and allege that "[m]ore than 360,000 county employees from over 1,900

counties currently participate in the Plan, with accumulated assets of more than $8.0 billion."[4]

---

[2] The exhibits attached to the First Amended Complaint include (1) the "National Association of Counties Deferred Compensation Program Member County Administrative Agreement," dated April 28, 1989 (Doc. No. 54-1); (2) the "Resolution Establishing a Deferred Compensation Plan for Orange County," dated April 17, 1989 (Doc. No. 54-2); (3) the "Nationwide Retirement Solutions, Inc. Deferred Compensation Plan for Public Employees," an unexecuted document with an effective date of January 1, 2006 (Doc. No. 54-3); and (4) the "Deferred Compensation Plan for Public Employees," dated December 14, 1989 (Doc. No. 54-4).

[3] The parties do not dispute that the OCBCC constitutes a "political subdivision."  *See also* Fla. Const. Art. VIII § 1(a) (defining "political subdivisions" as "counties").

[4] While alleging that a single plan exists, Plaintiffs also recognize that the employees of different counties may have participated in separate plans:

> Nationwide has indicated that the Deferred Compensation Plan for Public Employees is actually a multitude of plans that each have a different sponsor, and are each governed by a different plan document.  Plaintiffs, however, believe that if a multitude of plans exist, the terms of these plans are substantially the same, and any differences in the plans will not affect class certification or the merits of

(Doc. No. 54 ¶¶ 14, 15.)  With respect to the Plan allegedly participated in by county employees nationally, Plaintiffs allege (1) that NACo, or NACo and Nationwide, established and maintained the Plan; (2) that NACo was the "Plan Sponsor;" (3) that Nationwide was the "Plan Administrator;" and (4) that the OCBCC "adopted" the Plan.  (*Id.* at ¶¶ 52, 53, 55, 56, 65.)

Defendants argue that Plaintiffs conflate NACo's endorsement of the Plan with its establishment of the Program.  (Doc. No. 58 pp. 13, 18-19); (Doc. No. 59 p. 10).  As alleged in the First Amended Complaint, NACo partners with Nationwide "to provide county employees access to a competitive deferred compensation program."  (Doc. No. 54 ¶ 17.)  According to NACo, membership in the Program allows counties to sponsor and establish their own deferred compensation plans pursuant to section 457.  (Doc. No. 58 p. 8.)  In *Daniels-Hall v. National Education Association*, the Ninth Circuit distinguished between a similar program, which marketed variable annuities, and a variable annuity plan.  629 F.3d 992 (9th Cir. 2010).  Plaintiffs, employees of public school districts and members of a public employee labor union, participated in a "section 403(b)" retirement plan.[5]  *Id.* at 995-96.  Plaintiffs alleged that the union established an "employee pension benefit plan" pursuant to ERISA by endorsing, marketing and promoting certain annuities to its members.  *Id.* at 996.  The Ninth Circuit disagreed, and found that a marketing campaign designed to persuade union members to invest in section 403(b) annuities did not constitute "an employee pension benefit plan."  *Id.*

Additionally, the court found that the school districts "established or maintained" the

---

this case.  Thus, Plaintiffs' allegations in this Complaint will refer to the plans as a single plan.

(Doc. No. 54 ¶ 15 n.1.)

[5] Section 403(b) of the Internal Revenue Code allows employees of public schools, churches and section 501(c)(3) organizations to invest in tax-sheltered annuities.  26 U.S.C. § 403(b)(1)(A).

plans, in part because "the structure of a section 403(b) plan necessarily implicate[d] governmental action."  *Id.* at 1003.  *See also Montoya v. ING Life Ins. & Annuity Co.*, 653 F. Supp. 2d 344, 353 (S.D. N.Y. 2009) (recognizing that if the court held that a school district did not establish or maintain a section 403 plan, it "would call into question the benefits plaintiffs have received over the years by participating in the [plan]").  Similarly, to qualify as an "eligible deferred compensation plan" pursuant to section 457, the plan must be "established and maintained by an eligible employer."  26 U.S.C. § 457(b).  An "eligible employer" includes "a State, political subdivision of a State, and any agency or instrumentality of a State or political subdivision of a State."  26 U.S.C. § 457(e)(1)(A).  Though Plaintiffs argue that "the Plan at issue in this case is actually a private deferred compensation plan," (Doc. No. 65 p. 6), the exhibits attached to the First Amended Complaint demonstrate that the OCBCC established Plaintiffs' section 457 "Deferred Compensation Plan for Public Employees."

## B.  The Establishment of the Plan

The exhibits contradict Plaintiffs' allegations (1) that Nationwide and NACo "established the Plan to provide retirement income to employees" and (2) that "NACo is the entity that established the Plan." (Doc. No. 54 ¶¶ 52, 56.)  On April 17, 1989, the OCBCC executed "A Resolution Establishing a Deferred Compensation Plan for Orange County" (the "Resolution"). (Doc. No. 54-2.)  Later that year, the OCBCC executed the "Deferred Compensation Plan for Public Employees" pursuant to the "National Association of Counties Deferred Compensation Program" (the "1989 Plan").[6]  (Doc. No. 54-4.)  In the Resolution, the OCBCC "adopt[ed] the National Association of Counties Deferred Compensation Program and [] establishe[d] the

---

[6] In the First Amended Complaint, Plaintiffs describe the 1989 Plan as the "Original Plan Document."  (Doc. No. 54 ¶ 63.)

Orange County Deferred Compensation Plan for the voluntary participation of all eligible Orange County employees and elected officials." (Doc. No. 54-2.)  Though Plaintiffs cite to the Resolution when alleging that NACo established the Plan, the Resolution actually states that NACo established the Master Deferred Compensation Program. (Doc. No. 54-2) ("Whereas, [NACo] has established a Master Deferred Compensation Program for its member Counties.").

Plaintiffs concede that "the OCBCC's execution of the 1989 Plan Document, combined with its Resolution purporting to establish a deferred compensation plan[,] might normally constitute the 'establish[ment]' of a Plan for the purposes of ERISA's 'government plan' exemption." (Doc. No. 65 p. 13.)  Plaintiffs contend, however, that the OCBCC's execution of NACo's "Deferred Compensation Program Member County Administrative Agreement" (the "Administrative Agreement") "alters the usual analysis." (*Id*.)  Plaintiffs interpret the Administrative Agreement as delegating "all regulatory, operational, administrative, and other Plan management responsibilities to NACo, and then [giving] NACo the authority to delegate administrative responsibilities to Nationwide." (*Id.* at 13-14.)  Plaintiffs argue that pursuant to the Administrative Agreement, the OCBCC adopted the Plan that NACo had already established. (*Id.* at 14.)

Executed by NACo, Nationwide, and the OCBCC, the Administrative Agreement defined the responsibilities accepted by NACo and the OCBCC pursuant to NACo's Deferred Compensation Program.[7] (Doc. No. 54-1.)  For example, the OCBCC agreed to cooperate with and provide support for the administration of the salary deferral system for employee

---

[7] While the Administrative Agreement lists PEBSCO, not Nationwide, as an executing party, the parties do not dispute that PEBSCO and Nationwide are the same entity for purposes of this motion.

contributions; disseminate promotional materials to employees; and name a county official to act as an administrator. (*Id.*) NACo agreed to monitor the selected investment media and Nationwide's performance, accounting and audit systems. (*Id.*) Even taken as true and in the light most favorable to Plaintiffs, the Administrative Agreement does not support the inference that NACo "established" the Plan. Furthermore, Plaintiffs' argument that the OCBCC did not "maintain" the Plan pursuant to Administrative Agreement does not suffice. (Doc. No. 65 p. 14.) The governmental plan exception applies to plans "established or maintained" by a government entity. 29 U.S.C. § 1002(32) (emphasis added).

### C. The Employment Relationship

Additionally, Plaintiffs' allegations that NACo or Nationwide established the Plan do not comport with the purpose of "the 'established or maintained' requirement[, which] is designed to ensure that the plan is part of an employment relationship." *Anderson*, 369 F.3d at 1263. "ERISA does not apply unless the employer itself established *or* maintained the plan." *Id.* (citations omitted) (emphasis in original). The 1989 Plan defines the "Employer" as the OCBCC or "any of its agencies, departments, subdivisions or instrumentalities for which services are performed by a Participant" and "Participants" as the "Public Employees" of the OCBCC. (Doc. No. 54-4.) Furthermore, Plaintiffs allege that they participated in the Plan as employees of the OCBCC. (Doc. No. 54 ¶¶ 35, 41.)

Similarly, ERISA defines "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. 1002(5). Though Plaintiffs concede that the OCBCC was the "employer" with respect to the Plan, they

also argue that ERISA's broad definition of "employer" encompasses NACo.  (Doc. No. 65 p. 11.)  Plaintiffs argue that "NACo acted indirectly in the interest of the OCBCC by establishing and maintaining the Plan and allowing the OCBCC's employees to participate in the Plan."  (*Id*.)  According to Plaintiffs, "regardless of whether NACo technically constitutes a 'group of employers,' the ERISA definition of 'employer' is quite broad, and NACo also acted as an 'employer' by acting 'indirectly in the interest of an employer, in relation to an employee benefit plan.' "  (*Id*.)  However Plaintiffs allege that only the OCBCC employed them.  In this context, the definition of "employer" is not broad enough to include NACo.[8]  *See Nichols v. Se. Health Plan of Ala., Inc.*, 859 F. Supp. 553, 558 (S.D. Ala. 1993) (interpreting the term "acting . . . indirectly in the interest of an employer" as referring to "an entity which becomes the *de facto* employer of a person, after that person's employer has given up direct control over the person, but has retained the fruits of that person's labor").

Finally, the Administrative Agreement contradicts Plaintiffs' allegation that NACo was the Plan Sponsor. (Doc. No. 54 ¶ 55) (citing Doc. No. 54-1, the Administrative Agreement). Rather than listing NACo as the "Plan Sponsor," the Administrative Agreement designates NACo the "Program Sponsor."  (Doc. No. 54-1) ("NACo has agreed to sponsor the Program."). Despite Plaintiffs' allegations that the OCBCC did not expressly agree to become the Plan Sponsor, ERISA's definition of "plan sponsor" appears to encompass only the OCBCC.  (Doc. No. 54 ¶ 59.)  *See* 29 U.S.C. § 1002(16)(B)(i) (defining the "plan sponsor" as "the employer in the case of an employee benefit plan").

---

[8] A bankruptcy court in this district found that NACo established a county employee's deferred compensation plan and constituted a "group of employers acting indirectly in the interest of an employer."  *See In re Handshaw*, 198 B.R. 633 (Bankr. M.D. Fla. 1996).  As discussed in Part IV.D, the court respectfully declines to follow this reasoning.

### D. *In re Handshaw*

Though *In re Handshaw* appears to support Plaintiffs' position, it does not establish that the Plan is a governmental plan.  198 B.R. 633, 635-36 (Bankr. M.D. Fla. 1996).  In the First Amended Complaint, Plaintiffs allege that

> [w]hile the Administrative Agreement states that "NACo sponsors a prototype deferred compensation program (Program) pursuant to section 457 of the Internal Revenue Code," a bankruptcy case from this jurisdiction has held that the Plan is not a "government plan" as that term is defined by ERISA, because the Plan was not "established or maintained by the government of any State, or political subdivision of the same."

(Doc. No. 54 ¶ 54) (quoting *In re Handshaw*, 198 B.R. at 635-36).  In *Handshaw*, a debtor participated in two plans: a Collier County, Florida Deferred Compensation Plan (the "County Plan") and the "National Association of Counties Deferred Compensation Plan" (the "NACo Plan").  198 B.R. at 634.  The parties agreed that ERISA did not govern the County Plan pursuant to the governmental plan exception.  *Id.*  However, the court addressed whether ERISA governed the NACo Plan, in order to determine whether the debtor could exempt the NACo Plan pursuant to Florida Statute § 112.215(10)(a).[9]  *Id.*  The court found that ERISA governed the NACo Plan because NACo, not Collier County, established the plan.  *Id.* at 636.

First, the court need not accept as true Plaintiffs' legal conclusion that the Plan is not a "government plan" because it is "the same plan" at issue in *Handshaw*.  (*See* Doc. No. 54 ¶ 54.)

---

[9] Section 112.215(10)(a), a provision of the "Government Employees' Deferred Compensation Plan Act," exempts pensions accrued under a deferred compensation plan from "execution or attachment or to any legal process whatsoever by a creditor."  The trustee argued that the Florida statute did not exempt the NACo Plan because ERISA preempted any state law relating to an employee benefit plan otherwise subject to ERISA.  *In re Handshaw*, 198 B.R. 633, 635 (Bankr. M.D. Fla. 1996).

Second, the factual dissimilarities between *Handshaw* and the instant case counsel against the court's adoption of its reasoning.[10]  Most importantly, the parties in *Handshaw*, the debtor and trustee, agreed that NACo established the "NACo Plan."  *Id.* at 635 ("It is without dispute that Collier County did not, 'establish or maintain' the NACo Plan, and the NACo Deferred Compensation Plan was established by an entity other than Collier County, e.g., the National Association of Counties of which Collier County is a participating member.").  No such agreement exists in the present case.  Thus, *Handshaw* does not alter the court's conclusion that the OCBCC established the Plan.

### E. Conclusion

The exhibits attached to the First Amended Complaint contradict Plaintiffs' conclusory allegations that NACo, or NACo and Nationwide, established the Plan.  *See Griffin*, 496 F.3d at 1206.  The fact that Plaintiffs rely on the exhibits in their complaint to support these allegations bolsters the court's conclusion.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009); *Thompson v. Ill. Dep't. of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002) ("The fact remains that where a plaintiff attaches documents and relies upon the documents to form the basis for a claim or part of a claim, dismissal is appropriate if the document negates the claim."). Furthermore, the exhibits confirm that the OCBCC established the Plan.  *See Griffin*, 496 F.3d at 1206.  Because Plaintiffs participated in a governmental plan exempt from ERISA, Count I must

---

[10] The court reaches the same conclusion with respect to *In re Turner*.  261 B.R. 767 (Bankr. M.D. Fla. 2001).

be dismissed as a matter of law.   Furthermore, the filing of Plaintiffs' Second Amended Complaint does not change the court's conclusion that the Plan is exempt from ERISA.[11]

## V. STATE LAW BREACH OF FIDUCIARY DUTY

NACo and Nationwide move to dismiss Counts II, III, IV and V as preempted by the Securities Litigation Uniform Standards Act ("SLUSA").   Additionally, NACo moves to dismiss Plaintiffs' state law claims for failure to allege that NACo owes Plaintiffs a fiduciary duty.   (Doc. No. 58.)   Nationwide also moves to dismiss the state law claims on the grounds (1) that Plaintiffs do not allege that Nationwide owes Plaintiffs a fiduciary duty or breached a fiduciary duty; (2) that the statute of limitations bar Plaintiffs' claims;[12]   (3) that the economic loss rule bars Plaintiffs' claims; and (4) that Plaintiffs lack standing to pursue a claim based on a breach of fiduciary duty.   (Doc. No. 59.)   Because the court finds that SLUSA requires the dismissal of Counts II, III, IV and V, it will not address Defendants' remaining arguments.

---

[11] In their response to Plaintiffs' Motion for Leave to Amend, Defendants argue that the court should deny amendment of Count I as futile.  (Doc. No. 118.)  Rather than addressing the futility of their ERISA claim, Plaintiffs essentially concede the same:

> Since the beginning of this case, Plaintiffs have been aware of the possibility that the Court might hold that the OCBCC Plan is a government plan that is not subject to ERISA.   This is the precise reason that Plaintiffs pleaded their Complaint in the alternative, and stated in a footnote that "[i]f the Court determines that the Plan is not governed by ERISA, Plaintiffs hereby allege the following state law causes of action."  As stated in Plaintiffs' Reply in Support of Motion for Class Certification, however, Plaintiffs believed that asserting the ERISA claims was the most prudent course of action, considering the existence of two opinions from the Bankruptcy Court for the Middle District of Florida that suggested that the OCBCC Plan was governed by ERISA.   Therefore, until this Court rules otherwise, Plaintiffs must maintain the ERISA claims in their Complaint in accordance with Middle District precedent.

(Doc. No. 122 p. 11 n.52.) (citations omitted).  Because *Handshaw* and *Turner* do not control the court's analysis, Count I will be dismissed without leave to amend.

[12] NACo incorporates this argument by reference.  (Doc. No. 58 p. 32.)

### A. SLUSA

Congress passed SLUSA to further the goal sought to be achieved by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which attempted to curb nuisance class action filings by implementing a heightened pleading standard and an automatic stay of discovery pending resolution of a motion to dismiss. *Instituto de Prevision Militar v. Merrill Lynch*, 546 F.3d 1340, 1344-45 (11th Cir. 2008).   However, class action plaintiffs began frustrating the purpose of the PSLRA by bringing securities fraud actions under state law and in state court. *Id.*   As a result, "Congress enacted [SLUSA] to ensure that securities fraud class actions were brought under federal law and in federal court." *Id.* at 1344.

 "SLUSA does not actually pre-empt any state cause of action.  It simply denies plaintiffs the right to use the class action device to vindicate certain claims." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 87 (2006).  SLUSA prohibits any "covered class action" based upon the statutory or common law of any State from being maintained in state or federal court if a private party alleges

> (1) an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b).  Therefore, SLUSA precludes Counts II, III, IV and V if they constitute (1) a "covered class action"  (2) "based upon the statutory or common law of any State," (3) alleging a misrepresentation or omission or the use of a manipulative device "in connection with the purchase or sale" of (4) a "covered security." *Instituto*, 546 F.3d at 1345 (quoting 15 U.S.C. § 78bb(f)(1)).  SLUSA defines a "covered class action" as one in which damages are sought on

behalf of more than 50 people.   15 U.S.C. § 77p(f)(2)(A)(i).[13]   A "covered security" includes

those listed on the New York Stock Exchange or issued by "an investment company that is

registered, or that has filed a registration statement, under the Investment Company Act of

1940."   15 U.S.C. §§ 77r(b)(1) & (2).   To occur "in connection with" a misrepresentation, the

fraud alleged must " 'coincide' with a securities transaction–whether by the plaintiff or by

someone else."   *Dabit*, 547 U.S. at 85.   "Put another way, 'in connection with the purchase or

sale' of a security under SLUSA covers, at minimum, claims by purchasers, sellers, *and holders*

of securities."   *Instituto*, 546 F.3d at 1348 (interpreting the Supreme Court's holding in *Dabit*)

(emphasis in original).

Plaintiffs do not dispute that their claims constitute a "covered" class action based on

state statutory or common law and the sale of a covered security.[14]   Rather, Plaintiffs argue that

---

[13] A "covered class action" includes a lawsuit in which

> (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to individualized issues of reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

> (II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members.

15 U.S.C. § 77p(f)(2)(A)(i).

[14] In any event, the court finds that these SLUSA requirements are met.   First, Plaintiffs allege that "at least thousands of members" belong to the putative class and that "Plaintiffs' and Class members' claims involve common questions of fact and law which will predominate over any individual issues." (Doc. No. 54 ¶¶ 45, 46.)   Second, Counts II, III, IV and V are based on Defendants' breach of fiduciary duty, which Plaintiffs describe as "state law causes of action." (*Id.* at 19 n.5.)   Finally, Plaintiffs' allegations concern the sale of a "variable annuity," which the

they have not alleged that Nationwide or NACo made a "misrepresentation or omission of material fact," or "used or employed any manipulative device or contrivance," in connection with the purchase or sale of a covered security.  (Doc. No. 65 pp. 15-24.)

However, SLUSA preemption does not turn on the presence of overt allegations of fraudulent activity.  *See Behlen v. Merrill Lynch*, 311 F.3d 1087, 1096 (11th Cir. 2002).  Rather, the court can scrutinize the pleadings to determine the "essence" of the state law claim alleged in order to prevent plaintiffs from avoiding SLUSA by artfully drafting their complaint.[15]  *Atkinson v. Morgan Asset Mgmt., Inc.*, 658 F.3d 549, 555 (6th Cir. 2011) ("In deciding whether SLUSA applies, we review the substance of a complaint's allegations, and claimants cannot avoid its application through artful pleading that removes the covered words . . . but leaves in the covered concepts.") (citations and quotations omitted).  For example, the plaintiffs in *Dudek v. Prudential Securities, Inc.*, filed a class action based on the allegedly improper marketing of tax-deferred annuities, which entailed extra fees and costs, to accounts that already enjoyed tax-deferred status.  295 F.3d 875, 878 (8th Cir. 2002).  The district court dismissed the action as preempted by SLUSA.  *Id.*  In affirming, the Eighth Circuit reasoned that

> the essence of both complaints is the unlawful marketing of tax-deferred annuities, either by misrepresenting their suitability for tax-deferred retirement plans, or by failing to disclose their unsuitability for such accounts.  In substance, both complaints allege that defendants misstated or omitted material facts in

---

courts have interpreted as a "covered security."  *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69-73 (1959) ("*VALIC*") (classifying variable annuities as securities subject to federal securities law); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 109 (2d Cir. 2001) (applying *VALIC* and holding that as securities, variable annuities satisfy the "covered security" definition of SLUSA).

[15] Thus, the following allegation does not impact the court's analysis: "[n]o claim or count alleged herein is based on any misrepresentation or nondisclosure by any Defendant, nor do Plaintiffs allege that the Defendants used or employed any manipulative device or contrivance in connection with the sale of a security."  (Doc. No. 54 ¶ 28.)

connection with the purchase and sale of the tax-deferred annuities.  Moreover, fairly read, plaintiffs' [] complaint alleges that defendants "used or employed [a] deceptive device or contrivance in connection with the purchase or sale of a covered security. . . ."

*Id.* at 880.   Other courts have similarly found that "[t]he element of a misrepresentation or omission of a material fact is satisfied when a plaintiff alleges a misrepresentation concerning the value of the securities . . . sold or the consideration received in return."  *Arajuo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 382 (E.D. N.Y. 2002) (citations and quotations omitted).

Additionally, one district court found that SLUSA barred breach of fiduciary duty claims based on an endorsement arrangement similar to the one allegedly enjoyed by NACo and Nationwide.  *See Montoya v. N.Y. State United Teachers*, 754 F. Supp. 2d 466 (E.D. N.Y. 2010).  In *Montoya*, teachers who invested in section 403(b) tax deferred annuity programs brought a class action complaint against ING and the teachers' union.  *Id.* at 469.   ING offered the programs, and the teachers' union endorsed the programs to its members in exchange for a multi-million dollar fee.  *Id.*   Plaintiffs alleged that the teachers' union breached its fiduciary duty because the fee, not the suitability of the investment, compelled the union to endorse the ING program.  *Id.*   Despite the fact that Plaintiffs "assiduously avoid[ed] words and phrases using the terms 'manipulative deceptive device,' 'disclose,' 'disclosure,' 'duty to disclose,' or 'omission,'" the court found that SLUSA barred Plaintiffs' claims:

> [h]ad Defendants based their endorsement of the Programs on Plaintiffs' best financial interests and/or disclosed the relationship that is alleged to have driven the exclusive endorsement, there would be no breach of the fiduciary duty alleged.  Engaging in the exclusive endorsement in return for payment, and the failure to make proper disclosure are necessarily the same conduct supporting the alleged breaches of fiduciary duty.  There is no question but that Plaintiffs' claim turns upon whether or not it was appropriate to receive payments in exchange for allegedly objective investment advice, and whether there was a duty to disclose the alleged conflict of interest underlying the exclusive endorsement arrangement.

*Id.* at 473.   In conclusion, the court found the alleged scheme and/or omissions were made "in connection with" a covered security because plaintiffs alleged they had invested in the programs based upon the misleading endorsement.  *Id.* at 474.

"While plaintiffs may not avoid SLUSA pre-emption simply by artful pleading that avoids the actual words 'misrepresentation' or 'fraud,' neither may defendants avoid every possible claim by recasting any lawsuit in which a securities broker is a defendant into a securities fraud action." *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 387 (S.D. N.Y. 2004) (holding that SLUSA did not apply where plaintiffs alleged that defendants did not provide the full range of portfolio management services paid for and failed to satisfy fiduciary duties to act in plaintiffs' best interests) (citations omitted); *Magyery v. Transamerica Fin. Advisors, Inc.*, 315 F. Supp. 2d 954 (N.D. Ind. 2004) (finding that SLUSA did not bar claim alleging that defendant engaged in unauthorized trading).  Plaintiffs respond that their breach of fiduciary duty claims do not involve a misrepresentation or omission because "misrepresentation" is not an element of their breach of fiduciary duty claims under Florida law. (Doc. No. 65 p. 17.)  However, "[SLUSA] does not ask whether the complaint makes 'material' or 'dependent' allegations of misrepresentation in connection with buying or selling securities.  It asks whether the complaint includes these types of allegations . . . ." *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 311 (6th Cir. 2009).  Plaintiffs emphasize that their breach of fiduciary duty claims stem solely from "(1) Nationwide's payment of the endorsement fee, (2) NACo's acceptance of the endorsement fee, and (3) Nationwide's selection of the variable annuity for the Plan Participants." (Doc. No. 65 p. 16.)  However, as discussed below, the gravamen of the First Amended Complaint concerns NACo and Nationwide's misrepresentation, or deceptive device,

with respect to the suitability of the plan investments.

## B. Propriety of Dismissal Under SLUSA

Plaintiffs allege that the high fees, costs and risks associated with the variable annuity rendered it an unsuitable investment.  (Doc. No. 54 ¶ 19.)  Plaintiffs also allege that Nationwide misrepresented the cost of the variable annuity in order to pay NACo the annual endorsement fee, to the extent that Nationwide could have lowered the cost in the amount of the annual fee paid to NACo.  (*Id.*)  According to Plaintiffs, the fact that Nationwide paid NACo the million-dollar fee indicates that "the true cost to Nationwide of managing the variable annuity was less (in the amount of the endorsement fee) than participants were charged."  (*Id.*)  Plaintiffs also allege that NACo misrepresented the quality of the Nationwide Plan:  "While NACo's disclosure asserted that NACo conducted a due diligence process before choosing to endorse Nationwide's Plan . . . the actual quality of Nationwide's Plan suggests otherwise."  (*Id.* at ¶ 18.)  Thus, Plaintiffs essentially allege that NACo misrepresented the quality of Nationwide's Plan in order to receive the fee from Nationwide, while Nationwide marketed the variable annuity in order to extract the high fees to pay NACo, despite its unsuitability for section 457 retirement plans.

Furthermore, the totality of Plaintiffs' allegations implies that NACo and Nationwide did not disclose this allegedly improper relationship.  For example, Plaintiffs allege that in mid-2007, "Nationwide had finally begun disclosing on its website that it was paying NACo . . . to push its retirement products to local government employees."  (*Id.* at ¶ 16.)  Plaintiffs also allege that Defendants capitalized on "[t]he fiduciary relationship of trust and confidence between NACo and Plaintiffs" because "Nationwide and NACo know that Plaintiffs are at an informational disadvantage with regard to retirement investments, and the trust and confidence inherent in

NACo's relationship with Plaintiffs and Class members made Plaintiffs and Class members more likely to accept NACo's endorsement of Nationwide's Plan." (*Id.* at ¶ 83.)  Therefore, Plaintiffs' claims encompass a misrepresentation or omission, or alleged "deceptive device," in connection with the sale of a covered security.  *See Dudek*, 295 F.3d at 880 (finding that plaintiffs alleged defendants "used or employed a deceptive device" by unlawfully marketing tax-deferred annuities).  Therefore, SLUSA bars Counts II, III, IV and V.

## VI. MOTION TO AMEND

Plaintiffs moved to amend their First Amended Complaint on August 16, 2011.  (Doc. No. 116.)  According to Plaintiffs, the depositions of four Nationwide corporate representatives in June revealed additional evidence necessitating amendment.  (*Id.* at 2.)  Because the court has not set a deadline within which to amend the pleadings, Plaintiffs' motion to amend is not untimely.

Rule 15(a)(2) provides that "leave shall be freely given when justice so requires."  In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court identified several circumstances justifying the denial of a motion to amend: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment."  Defendants argue that Plaintiffs' motion to amend should be denied for bad faith, prejudice, futility and failure to comply with the Local Rules.  (Doc. No. 118.)  As discussed below, the court will deny Plaintiffs' motion to amend as futile.

In their original complaint, Plaintiffs alleged that "NACo intentionally gave Plaintiffs unsound advice in order to collect its annual fee;" that NACo "disclosed for the first time" in

2009 that it received the annual fee from Nationwide; and that "NACo and Nationwide know that Nationwide's Plan is not suitable for the needs of Plaintiffs."  (Doc. No. 1 ¶¶ 17, 21.) Plaintiffs retreated from these overt allegations of fraud in the First Amended Complaint, but as discussed above, still essentially alleged that Nationwide misrepresented the suitability of the variable annuity and that NACo misrepresented the extent of its due diligence.  In the proposed Second Amended Complaint, Plaintiffs further pare down their allegations with respect to disclosure and unsuitability of Nationwide's investment products.   Plaintiffs allege that Nationwide generates money on all of the investment products it offers "by charging fees, receiving revenue sharing payments from mutual funds, or through the 'spread' on its fixed annuity product." (Doc. No. 122-2 ¶ 20.)  Therefore, Plaintiffs contend, Nationwide breached its fiduciary duty by exercising its discretion to select investment products for Plan assets that allowed Nationwide to extract enough revenue for Nationwide to make the annual endorsement payment, when it could have charged participants lower fees or offered greater returns.  (*Id*. at ¶¶ 20, 94.)   Plaintiffs further assert that despite knowing that Nationwide selected investment products which would generate revenue for the endorsement payment, NACo failed to "monitor [Nationwide] and its investment products and take such actions as were reasonably necessary to assure the Plan participants the best possible combination of costs, benefits, and services." (*Id*. at ¶¶ 77, 95.)  Finally, Plaintiffs allege that Nationwide and NACo "did not negotiate their annual endorsement fee agreement for the exclusive benefit of Plaintiffs and Class members, and Plaintiffs and Class members receive no benefit from [Nationwide's] payment of an annual fee to NACo."  (*Id*. at ¶ 22.)

As Plaintiffs repeatedly emphasize in their motion to amend, their "fundamental theory of recovery" has not changed.  (*See* Doc. No. 116 p. 3, 5, 6.)  According to Plaintiffs, "the proposed amendment to Plaintiffs' complaint will not fundamentally change their claims or allegations, it will simply add allegations that Plaintiffs and Class members suffered damages as a result of the fiduciary breaches of [Nationwide] and NACo, regardless of which investment product they chose to house their Plan contributions."[16]   Furthermore, the court is inclined to agree with Defendants' characterization of Plaintiffs' complaint as one in which Plaintiffs  allege that they "did not get what they thought they were getting" by investing in Nationwide's investment products.  (Doc. No. 118 p. 19.)  *See also Montoya*, 754 F. Supp. 2d at 473; *Dudek*, 295 F.3d at 880.   Allowing Plaintiffs to proceed in this manner would not comport with the broad interpretation courts have accorded SLUSA.  *See Dabit*, 547 U.S. at 86; *In re Enron Corp. Sec.*, 535 F.3d 325, 338 (5th Cir. 2008) (reasoning that Congress intended courts to interpret SLUSA broadly to accomplish the goals of the PSLRA) (citations omitted); *see also Behlen*, 311 F.3d at 1090 (holding that SLUSA preempted state law claims despite plaintiff's removal of "all explicit references to any fraudulent activity by the defendants").  While SLUSA bars Plaintiffs' class-wide claims, Plaintiffs can bring their state-law causes of action as individuals or as a group fewer than 50 plaintiffs.  *See Dabit*, 547 U.S. at 86.

## VII. CONCLUSION

Based on the foregoing, it is **ORDERED** as follows:

---

[16] In comparison, Plaintiffs alleged in the First Amended Complaint that Nationwide generates money to cover the cost of the NACo endorsement payment by providing Plan participants with a variable annuity.  (Doc. No. 54 ¶ 105.)

1. Defendants National Association of Counties ("NACo"), NACo Research Foundation, NACo Financial Services Corp., NACo Financial Services Center's Motion to Dismiss (Doc. No. 58), filed on March 21, 2011, is **GRANTED**.

2. Defendant Nationwide Retirement Solutions, Inc.'s Motion to Dismiss (Doc. No. 59), filed on March 21, 2011, is **GRANTED**.

3. Plaintiffs Camille McCullough and Melanie Monroe's Motion for Leave to File an Amended Complaint (Doc. No. 116), filed on August 16, 2011, is **DENIED**.

4. All remaining pending motions are **DENIED AS MOOT**.

5. Plaintiffs' class-wide claims are **DISMISSED WITH PREJUDICE**.  Plaintiffs' individual claims are **DISMISSED WITHOUT PREJUDICE**.

6. The Clerk is directed to **CLOSE** this case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on November 25, 2011.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Party